AJEM LABORATORIES, INC., and Centri-Spray Corporation, Plaintiffs-
Appellants,

v.

C. M. LADD CO., Inc., and Charles M. Ladd, Defendants-Appellees.

No. 19643.

United States Court of Appeals,
Sixth Circuit.

April 29, 1970.

John A. Mitchell, New York City, Abe A. Schmier, Schmier, Schmier & Dakmak, Detroit, Mich., on the brief; A. Thomas S. Safford, Curtis, Morris & Safford, New York City, of counsel, for appellants.

Benjamin W. Colman, Southfield, Mich., Julius Denenberg, Head & Denenberg, Detroit, Mich., on the brief, for appellees.

Before WEICK, EDWARDS and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

The question posed by this case is whether the United States District Court for the Eastern District of Michigan was right in holding appellants' patent No. 2,979,062 invalid. The patent, issued April 11, 1961, covered a commercially successful automatic power washing machine for cleaning automobile engine heads and similar large castings. The District Court held the patent invalid because the device had been "on sale" for more than one year before the patent was applied for.

Appellants Ajem Laboratories, Inc., (owner of the patent in suit) and Centri-Spray Corporation (exclusive licensee) brought this action claiming infringement by appellees of claims 4 and 16 of their patent.

Upon appellees' motion, a separate trial was held on the "on sale" issue. Appellees contended before the District Judge, and now contend before us, that the facts developed in testimony on their motion to dismiss clearly showed the invalidity of the patent under section 102(b) of the Patent Act, 35 U.S.C. § 102(b) (1964). This section reads as follows:

"A person shall be entitled to a patent unless—

\*  \*  \*  \*  \*  \*

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States  \*  \*  \*."

The District Judge, after taking extensive evidence on the motion, made the following findings of fact:

"(11) Defendants established by substantial evidence, which Plaintiffs did not negate or overcome, that Plaintiff Centri-Spray, prior to the critical date, November 9, 1953, issued six (6) offers for sale or proposals for machines which embodied the invention defined in the Arnold Disclosure (Ex. P), in Claim 1 of the application as filed, in Claim 1 of the patent as issued, and in the originally-filed Method Claims 6, 7 and 8, upon which Plaintiffs later, in 1960, purportedly based their amendment claims which issued as patent Claims 4 and 16.

"(12) The Ford of Canada machine offered for sale in August 1952, more than two years prior to the filing date of the application for the patent in suit, and represented by Plaintiff at the trial to be substantially according

to the demonstration model, Exhibit 7, was ordered by Ford of Canada, constructed by Plaintiff Centri-Spray, shop-tested, approved by the customer, invoiced by Centri-Spray, paid for in full, and shipped to the customer before the critical date. The machines sold to Pontiac Motor Division and McKinnon Industries, Ltd. were proposed by Plaintiff Centri-Spray and ordered by these customers well before the critical date. In accordance with such contracts of sale, Plaintiff Centri-Spray proceeded to fabricate these machines and to embody therein the invention defined in the disclosure, the application and the claims of the issued patent.

"(13) Each of the offers and proposals for the sale of turret-type washing machines embodying the invention to Ford Motor Company-Highland Park, Ford Motor Company-Cleveland, and Chevrolet Manufacturing Division were made prior to the critical date, even though the purchase orders for the last two proposals were issued after the critical date and the machines were fabricated and shipped in due course.

"(14) Plaintiff Centri-Spray offerred these machines for sale in accordance with their regular promotional and competitive business practices and in the ordinary course of their business. At least the first of these washers, to Ford of Canada, was used in plaintiff's promotional sales efforts and shown to its prospective customers. The company's officers and sales representatives, in sales promotional discussions with their customers, imposed no obligation of secrecy or confidence, nor any restriction upon their disclosures regarding the nature of the washer construction that Centri-Spray was offering for sale and later built for them. These offers and sales were made and entered into solely for Plaintiffs' profit, to provide their customers with required washing equipment. The sales were undertaken and made in an atmosphere of competitive activity.

"(15) Substantial evidence was presented and the Court finds that none of the machines charged by Defendants to violate Section 102(b) were offered for sale as 'experimental' machines by Plaintiff Centri-Spray. No requirement was imposed by Plaintiff that the purchased machines be kept secret or in confidence, nor was any requirement made upon the customers that they submit to Plaintiffs regular or any test reports upon the functional operation, efficiency or inefficiency of the machines procured from Centri-Spray.

"(16) The customers of Plaintiff Centri-Spray did not understand nor consider these machines to be 'experimental' machines in any sense when they were ordered. They procured them for production use, as regular production equipment.

"(17) The facts establish that Plaintiff Centri-Spray itself did not consider nor treat the machines as either 'experimental' or 'developmental.' Plaintiffs did not request nor make any record of testing, and neither its own employees nor its customers' employees, or for that matter anyone else, kept or maintained any control record of the operational effectiveness of any of these washing machines offered for sale and sold before the critical date.

"(18) Plaintiff Centri-Spray offered each of these machines as a completely designed and operable piece of production equipment, ready when delivered to be installed and operated for production use at the plants of its customers. It appears from the evidence that at least two of these very earliest (1953) machines are still in operation today, a period of more than 15 years.

"(19) It clearly appears that any problems associated with the start-up and initial operation of these machines were merely matters of adjust-

ment after installation, rather than material changes in the nature or construction of the washers."

█ Appellants concede, as indeed the facts require, that the first application for the patent in suit was made November 9, 1954, and, hence, that the critical date in relation to the "on sale" provision of Section 102(b) is November 9, 1953. Appellant Centri-Spray also concedes that before November 9, 1953, the· critical date, it had issued six proposals for sale of the washing machine, which the District Court held was covered by the patent in suit. But appellants claim that in fact the invention had never been reduced to practice in this country before the critical date, and, hence, could not have been "on sale" within the meaning of Section 102(b). Involved in their contentions is the argument that the first of these machines, which was fabricated to the order of and sold to Ford Motor Company of Canada, Ltd., was not actually in production use prior to the critical date, and in any event, if it were found to have been, that such use was in a foreign country and did not represent reduction to practice for purposes of the "on sale" provisions of Section 102(b).

We find no need to deal with the problems posed by the arguments which pertain to the use of the machine by Ford of Canada on foreign soil. It seems clear to us that the evidence supports the District Judge's finding that the automatic washer ordered by Ford of Canada was completed in the United States at the Livonia Plant of appellant, was tried out there, and was used as a sales model during the summer of 1953. These facts, plus the five other proposals for sale of such machines prior to the critical date, and payment for the Ford of Canada machine prior to that same date appear to us to provide ample support for the finding of the District Judge that the invention had been on sale for more than one year prior to the date of the application for the patent.

For purposes of this case, we' will assume without deciding that reduction to practice of the invention is an essential of the proofs required for an "on sale" holding under Section 102(b).

This court has previously held (in a case dealing with Section 102(g)) that for patent purposes an invention may be reduced to practice by building a working model and operating it under simulated field conditions without the necessity of showing successful commercial use:

"Satisfactory reduction to practice of an invention does not, however, demand proof of successful commercial use. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Minnesota Mining & Mfg. Co. v. Van Cleef, 139 F.2d 550 (C.A.7, 1943). It does demand tests which successfully prove practical utility for its intended use. The Court of Customs and Patent Appeals has outlined these principles thus:

" 'To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. Ocumpaugh v. Norton, 25 App.D.C. 90; Van Auken v. Cummings, 49 F.2d 490, 18 C.C.P.A., Patents, 1250. Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, Mason v. Hepburn, 13 App.D.C. 86, 89, the machine must be tested under actual working conditions, Smith v. Nevin, 73 F.2d 940, 22 C.C.P.A., Patents, 748, in such a way as to demonstrate its practical utility for its intended purpose, Sydeman v. Thoma, 32 App.D.C. 362, 373; Feldmeier et al. v. Mojonnier, 97 F.2d 124, 25 C.C. P.A., Patents, 1158, beyond probability of failure, Taylor v. Swingle, 136 F.2d 914, 30 C.C.P.A., Patents, 1219. Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in

the environment in which its is contemplated to be useful. Lavin v. Pierotti, supra, [129 F.2d 883, 29 C. C.P.A., Patents, 1235]; Steenstrup v. Heath, 95 F.2d 514, 517, 25 C.C. P.A., Patents, 981, 986; Van Auken v. Cummings, supra.' Field v. Knowles, 183 F.2d 593, 601, 37 C.C. P.A. (Patents) 1211 (1950).

See also: Corona Cord Tire Co. v. Dovan Chemical Corp., supra; Elmore v. Schmitt, 278 F.2d 510, 47 C.C.P.A. (Patents) 958 (1960)." Toledo Scale Corporation v. Westinghouse Electric Corporation, 351 F.2d 173, 182 (6th Cir. 1965).

The facts in this case amply justify the District Judge's finding that the Ford of Canada machine was reduced to practice by the shop tests at the Centri-Spray plant. They also fully justify his rejection of appellants' arguments that this machine was "experimental" within the rule of Austin Machinery Co. v. Buckeye Traction Ditcher Co., 13 F.2d 697 (6th Cir.), cert. denied, 273 U.S. 747, 47 S.Ct. 448, 71 L.Ed. 871 (1926).

On this record we certainly cannot say that any of the findings of fact of the District Court on the Section 102(b) issue are "clearly erroneous." Fed.R.Civ. P. 52(a).

Much of appellants' argument, however, appears to center upon a particular locking device (the shot pin arrangement) employed to lock the turrets of the washer in place. This device was described in patent claims 4 and 16— particularly claim 16. Appellants appear to assert 1) that claim 16 alone represents an invention and 2) that this invention was not a part of the Ford of Canada washer and was not "on sale" prior to the critical date. As to this issue, appellants' brief states:

### "The Shot Pin Arrangement

"As stated previously, Claim 16 contains a material limitation which is directed to the indexing drive means. This is so-called shot pin arrangement.

In the words of the claim it is described as follows:

" ' * * * said indexing drive means for said turrets including a drive shaft for turning each of said turrets, a drive wheel connected to said shaft and having a plurality of openings arranged in a circular pattern concentric with said shaft, a drive arm swingably mounted for swinging movement along an arc concentric with said shaft and adjacent to said drive wheel, a drive cylinder having a piston connected to said arm for swinging the arm, a drive member carried by said arm intermittently engaging said openings in sequence to turn said shaft, a lacking cylinder mounted on the frame having a piston intermittently engaging said wheel for locking said turrets in alignment with said path * * *.'

"As stated, supra, this shot pin arrangement was not even conceived of and released for production until November 14, 1953. * * * Since this is clearly after the critical date of the application, November 9, 1953, and it is to a material part of Claim 16, Claim 16 cannot [be] said to have been on sale within the prohibition of 35 U.S.C. § 102(b) more than one year before the application was made." (Emphasis in original.)

Appellants are, however, in our view faced by hard choices.

If the invention claimed by appellants to have been infringed was disclosed in their application of November 9, 1954, in such broad claims as to include both the Ford of Canada mechanism and the "shot pin arrangement," then the patent is barred because the device was "on sale" for more than one year prior to that date for the reasons set out above.

If, on the other hand, claim 16 represents a separate invention of which "the shot pin arrangement" was an essential feature, such invention clearly was not disclosed by the patent application of November 9, 1954. As to such

a claim, the *Muncie Gear* doctrine of the Supreme Court requires adoption of a critical date one year before the first disclosure. Muncie Gear Works, Inc. v. Outboard, Marine and Manufacturing Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). Claims 4 and 16 were added by amendments on February 23 and April 25, 1960, and, hence, the critical dates applicable to this argument would be February 3, 1959 and April 25, 1959, respectively.

As to this feature of appellants' claims, the District Court found:

"(20) Plaintiffs asserted Claims 4 and 16 of the patent in suit against Defendants. These claims were filed as new apparatus claims by amendments more than five years after the filing date of the application, on February 3 and April 25, 1960. These new apparatus claims contained a definition of the horizontal transfer mechanism which read simply 'transfer means.' This definition was conceded by Plaintiffs' counsel at the trial to be an enlargement over the definition for such element in the apparatus claims previously limited by Plaintiffs to a 'shuttle-bar' transfer device, in their earlier prosecution of the application.

"(21) This attempt to enlarge the claim coverage followed the acquisition by Plaintiff Centri-Spray of an order from the Oldsmobile Division for two turret-type washers requiring a 'walking beam' transfer mechanism. This order was acquired in November 1959 upon offers for sale submitted by Plaintiff Centri-Spray in October. The washers were in fabrication at the time the first amendment was filed on February 3, 1960. The second amendment was filed shortly after shipment and delivery of the washers to Oldsmobile.

"(22) Plaintiffs obtained the entry of the amendments, whereby Claims 4 and 16 were issued in the patent, only after interviews by associate counsel with the Examiner in the Patent Office. These interviews were held following the termination of prosecution of the originally-filed claims, and following Plaintiff's receipt of Oldsmobile's order for the two 'walking beam' washers.

"(23) The critical dates of patent Claims 4 and 16 asserted against Defendants are February 3 and April 25, 1959. Prior to these critical dates, Plaintiff Centri-Spray admittedly sold machines coming within the definition of invention defined in these asserted claims."

In this record these findings also find such evidentiary support that they cannot be held to be "clearly erroneous."

Our inspection of this record convinces us that the concluding language of *Muncie Gear* is directly applicable to this aspect of appellants' contentions:

"It is clear to us, however, that the amendments of December 8, 1928, like the original application, wholly failed to disclose the invention now asserted.

"The claims in question are invalid if there was public use, or sale, of the device which they are claimed to cover, more than two years * before the first disclosure thereof to the Patent Office. Cf. Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 557, 559, 563–564, 24 L.Ed. 1053; Schriber-Schroth Co. v. Cleveland Trust Co., *supra*, 305 U.S. at page 57, 59 S.Ct. at page 12, 83 L.Ed. 34. Section 4886 of the Revised Statutes would in terms provide for their invalidity had they been offered by application rather than by amendment; and whatever may be the efficacy of an amendment as a substitute for an application, it surely can effect no more than the application itself.

"We think the conclusion is inescapable that there was public use, or sale, of devices embodying the asserted invention, more than two years before it was first presented to the Patent

* The applicable period is now one year. See 35 U.S.C. § 102(b) (1964).

Office." Muncie Gear Works, Inc. v. Outboard, Marine and Manufacturing Co., 315 U.S. 759, 768, 62 S.Ct. 865, 869 (1942).

*See also* Monroe Auto Equipment Company v. Heckethorn Manufacturing and Supply Company, 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S. Ct. 160, 13 L.Ed.2d 93 (1964).

The judgment of the District Court is affirmed.